UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Jeremy M. Peatman,

      Plaintiff,

    v.                                       Civil Action No. 5:10-cv-307

Michael J. Astrue,
Commissioner of Social Security,

      Defendant.

## REPORT AND RECOMMENDATION
(Docs. 13, 16)

Plaintiff Jeremy Peatman brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review and remand of the decision of the Commissioner

of Social Security ("Commissioner") denying his application for disability insurance

benefits. Pending before the Court are Peatman's motion to reverse the Commissioner's

decision (Doc. 13), and the Commissioner's motion to affirm the same (Doc. 16).

For the reasons stated below, I recommend that the Court DENY Peatman's

motion to reverse, and GRANT the Commissioner's motion to affirm.

## Background

Peatman was twenty-five years old on the alleged disability onset date of February

1, 2008.[1] (AR 41, 156, 163.) He completed high school, and has one year of training as

an automobile mechanic. (AR 25, 39, 197.) He has worked in the auto-repair industry as

---

[1] In his written application, Peatman set forth an alleged disability onset date of October 22, 2000.
(AR 39, 163.) At the administrative hearing, however, he changed the date to February 1, 2008, citing his
pre-2008 income levels and the fact that he did not stop working until February 2008. (AR 40-41.)

a service technician and a parts manager, and also has experience working on an assembly line and cleaning condominiums. (AR 192, 213-18.)

On October 22, 2000, Peatman sustained severe head injuries from an automobile accident in which he was a backseat passenger. (AR 25-26.) His hospital course included treatment for respiratory distress, decreased mental status, and seizure activity. (AR 280, 300, 305-09.) He made "excellent gains" during his rehabilitation stay, and was discharged on November 21, 2000, able to ambulate independently and complete activities of daily living with cueing. (AR 351-52.) Peatman's discharge diagnoses were traumatic brain injury, left mandible fracture, and alcohol abuse. (AR 352.) Despite the severity of his injuries, in 2003, Peatman was able to complete a course in automobile repair; and in 2005, he was working 50-55 hours weekly as a mechanic. (AR 197, 287.) Thereafter, Peatman reported suffering multiple additional head injuries, including in November 2005, March 2006, May 2006, and October 2009, respectively. (AR 33, 240-41, 243, 287, 409.)

In July 2008, Peatman protectively filed applications for supplemental security income ("SSI") and disability insurance benefits ("DIB"). (AR 156-64, 187, 191.) In his DIB application, Peatman alleged that, starting on October 22, 2000, the date of the above-described automobile accident, he became unable to work as a result of "head injury" and "chronic headach[e]," which caused him to lose focus and tire easily, have difficulty learning tasks and counting, be unable to stand for more than two-to-three hours, and be unable to bend over without having back pain. (AR 191.) At the administrative hearing, Peatman further alleged that, since approximately 2007, he has

2

suffered almost daily headaches which adversely affect his ability to concentrate, his memory, and his mood (AR 25-26, 47); and his most significant problem is his inability to concentrate, which has become progressively worse since 2000 (AR 43).

Peatman's application was denied initially and on reconsideration, and he timely requested an administrative hearing. (AR 69-98, 101.)  On May 11, 2010, Administrative Law Judge ("ALJ") Paul Martin conducted a hearing on the application. (AR 21-64.) Peatman appeared and testified, and was represented by a non-attorney representative. (AR 38-53.)  Additionally, Peatman's mother, his girlfriend, and vocational expert ("VE") Ralph Richardson testified at the hearing. (AR 26-38, 53-63.)  On May 28, 2010, the ALJ issued a decision finding that Peatman was not disabled based on his July 2008 application. (AR 16.)  Thereafter, the Decision Review Board affirmed the ALJ's decision, making it final. (AR 1-3.)  Having exhausted his administrative remedies, Peatman filed the Complaint in this action on December 16, 2010. (*See* Doc. 3.)

## ALJ Determination

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R.

3

Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d).

The claimant is presumptively disabled if the impairment meets or equals a listed

impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the fourth step requires the ALJ to

consider whether the claimant's "residual functional capacity" ("RFC") precludes the

performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). The

fifth and final step requires the ALJ to determine whether the claimant can do "any other

work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving

his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a

"limited burden shift to the Commissioner" to "show that there is work in the national

economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009)

(clarifying that the burden shift to the Commissioner at step five is limited, and the

Commissioner "need not provide additional evidence of the claimant's residual functional

capacity").

Employing this sequential analysis, ALJ Martin first determined that Peatman had

not engaged in substantial gainful activity since his alleged disability onset date. (AR 9.)

At step two, the ALJ found that Peatman had the severe impairments of "residuals from

traumatic brain injury and subsequent head traumas." (AR 10.) At step three, the ALJ

found that none of Peatman's impairments, alone or in combination, met or medically

equaled a listed impairment. (AR 10-11.) Next, the ALJ determined Peatman's RFC,

finding that he was able to perform "a full range of work at all exertional levels" except

that he could not perform tasks involving "complex written or verbal communications."

4

(AR 11.) The ALJ further found that Peatman would be able to understand, remember, and carry out "moderately complex four to five step tasks which do not involve multi-tasking"; he would be able to interact with coworkers and the public only "occasionally"; and his interaction with the public could be only "superficial." (*Id.*) Based on this RFC, the ALJ concluded that Peatman was unable to perform his past relevant work either as an automobile mechanic or an automobile parts department manager. (AR 13.) At step five, however, based on the VE's testimony, the ALJ determined that there are other jobs existing in significant numbers in the national economy that Peatman can perform, including cleaner and landscape laborer. (AR 14.) The ALJ concluded that Peatman had not been under a disability from the alleged onset date through the date of the decision. (AR 14-15.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore*, 566 F.3d at 305.

Although the reviewing court's role with respect to the Commissioner's disability decision is "quite limited[,] and substantial deference is to be afforded the Commissioner's decision," *Hernandez v. Barnhart*, No. 05 Civ. 9586, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (quotation marks and citation omitted), the Social Security Act "must be construed liberally because it is a remedial statute that is intended to include, rather than exclude, potential recipients of benefits," *Jones v. Apfel*, 66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999); *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981) ("In its deliberations the District Court should consider the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied.").

6

## Analysis

### I.    The ALJ Properly Considered Peatman's Headaches.

Peatman claims the ALJ failed to consider the impact of his migraine headaches on his ability to work.  In fact, however, at step two, the ALJ stated that Peatman had the severe impairments of "residuals from traumatic brain injury and subsequent head traumas."  (AR 10.)  A review of the record reveals that Peatman's migraine headaches were connected to his head injuries, which originated as a result of the October 2000 automobile accident.  Therefore, the ALJ's severity determination with respect to Peatman's "residuals from traumatic brain injury and subsequent head traumas" implicitly included Peatman's headaches.  Moreover, the ALJ explicitly discussed Peatman's headaches throughout his decision, and particularly in the context of his RFC determination, noting that Peatman underwent an EEG for "acute, short parietal headaches"; that Peatman reported "a couple months of headaches" in July 2008 "which he suggested he had had in the past"; that recent treatment notes described "efforts to manage [Peatman's] headaches with various medications"; and that Peatman had sought treatment "in the past couple of years for complaints of recurrent headaches."  (AR 12.)

Despite the existence of records documenting Peatman's headaches, however, and despite the ALJ's finding that Peatman "does have 'severe' residuals from his multiple brain injuries," the ALJ determined as follows: "based upon the limited objective medical evidence underpinning his allegations, his years of successful functioning following the original brain injury, his activities of daily living[,] and his limited follow-through with treatment, I am obliged to find the severity of his impairments overstated."  (AR 12.)  As

7

discussed in detail below, substantial evidence supports these findings.  Moreover, it is clear from this statement that, although the ALJ noted that objective testing with respect to Peatman's headaches was "unremarkable" (AR 12), he did not rely exclusively on such testing in determining Peatman's RFC.  Therefore, this case is distinguishable from *Ortega v. Chater*, 933 F. Supp. 1071 (S.D. Fla. 1996), cited in Peatman's motion.

Peatman asserts that the ALJ should have discussed the July 2009 consultative report of Dr. Waqar Waheed, which described and assessed Peatman's headaches.  (AR 464-66.)  It is true that the ALJ did not discuss this report in his decision.  However, the Second Circuit has stated that, although "[t]he crucial factors in [an ALJ's] determination must be set forth with sufficient specificity to enable [the court] to decide whether the determination is supported by substantial evidence," *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984), the ALJ is not required "to explicitly reconcile every conflicting shred of medical testimony," *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981).  Rather, where the evidence permits the court "to glean the rationale of an ALJ's decision," the ALJ is not required "to have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (citing *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)).  Here, the ALJ clearly explained his rationale in determining Peatman's RFC, as quoted above.

More importantly, Dr. Waheed's report is of little consequence with respect to the ALJ's disability determination, given that, not only is the report primarily based on Peatman's subjective self-reporting (AR 464), which the ALJ found to be "overstated"

8

(AR 12), but the findings made therein are unremarkable.  Specifically, Dr. Waheed noted in the report that Peatman's attention, memory, and concentration were "intact," and that his cranial nerve examination, motor examination, and sensory examination yielded normal results.  (AR 465-66.)  He further noted that head imaging done in 2006 was normal, and a current neurological examination was "nonfocal."  (AR 466.)  Dr. Waheed concluded that Peatman's headaches were "consistent with migraine without aura," and increased Peatman's dosage of medication.  (*Id.*)  Accordingly, other than documenting Peatman's subjective complaints and historical summary of his headaches, Dr. Waheed's report does little more than make a diagnosis of migraine headaches.  It is well-settled in this Circuit, however, that a mere diagnosis of an impairment is not sufficient to prove disability.  *Williams v. Bowen*, 859 F.2d 255, 259 (2d Cir. 1988).

## II.     Substantial Evidence Supports the ALJ's Mental RFC Determination.

As described above, the ALJ determined that Peatman retained the functional capacity for work which would not involve complex written or verbal communications; and that Peatman could understand, remember, and carry out only moderately complex four-to-five-step tasks which would not involve multi-tasking.  (AR 11.)  In addition, the ALJ determined that Peatman could only occasionally interact with coworkers and the public, and his interaction with the public had to be superficial.  (*Id.*)  Peatman asserts that this RFC determination is not based on substantial evidence, and is not supported by the opinions of any physicians of record but instead is improperly based on the ALJ's own interpretation of the "raw medical data."  (Doc. 13 at 13.)  I disagree, and find that the ALJ's RFC determination is supported by substantial evidence.

As noted in the ALJ's decision, although Peatman suffered a closed head injury in October 2000 and "experienced multiple contusions with antegrade memory difficulties for about four months"; by discharge from rehabilitation, Peatman "exhibited increasing recall of recent events, only mild deficits in reasoning and problem[-]solving[,] and overall good attention and orientation."[2] (AR 12; *see* AR 351.) As also noted in the ALJ's decision, neuropsychological testing performed approximately one month after the October 2000 injury revealed that Peatman's cognitive functioning was "largely within the normal range." (AR 12; *see* AR 363.) In a December 2005 medical report from treating physician Dr. Lawrence Jenkyn, Dr. Jenkyn summarized Peatman's condition at the time of his original head injury and in the years following:

> [At] [a]ge 23, [Peatman] was rendered comatose for a week following an alcohol-related automobile accident in October, 2000. . . . [H]is head was eventually crushed . . . between the collapsed roof of the car and the driver's seat. CT scanning at the time revealed a right thalamic hemorrhage which resolved by way of follow[-]up CT scan in February, 2001. [H]e was left with postconcussion syndrome symptoms which resolved over time and difficulty using his left side in a coordinated fashion. This too has improved. He now works as an auto mechanic 50 to 55 hours per week and his work is regarded as acceptable by his employer and customers alike.

(AR 287.) Thereafter, Peatman apparently struck his head multiple times, and he claims each strike caused a return of his post-concussion syndrome symptoms. In April 2006,

---

[2] Although the alleged disability onset date was amended to February 1, 2008, well after Peatman's initial October 2000 head injury, Peatman's condition prior to February 2008 is still relevant to Peatman's claim, especially considering Peatman's testimony at the administrative hearing that, although his ability to concentrate has "been worse since probably January of 2008," it has "been progressively getting worse . . . since 2000." (AR 43.) Moreover, when the ALJ asked Peatman at the hearing whether anything happened in January 2008 that caused his condition to become significantly worse as of that date, Peatman testified that he was just using that date because that was "the last job that [he] held consistently." (AR 44.) As noted below, however, Peatman told a medical provider that he stopped working in January 2008 not due to a worsening of his condition, but rather, because he lost his ability to drive to work as a result of receiving his third driving under the influence offense. (AR 420.)

Dr. Jenkyn saw Peatman after his most recent head injury which Peatman reported to the Doctor involved him hitting his head with a wrench at work. (AR 290.) Dr. Jenkyn noted that Peatman "has been spending up to 55 hours per week at work," and stated that Peatman "needs to cut back to a maximum of 40 hours per week if not less." (*Id.*) The Doctor further noted that x-rays of the lumbar spine, CT scanning of the brain and lumbar spine, SPECT scanning of the brain, and electroencephalogram all revealed "normal" results. (*Id.*) Accordingly, Dr. Jenkyn made no changes to Peatman's treatment plan or medications, and referred him for "neuropsychometric testing" to determine the consequences of his multiple concussions. (AR 291.) It appears that Peatman never followed through with such testing.[3] (AR 394.) Although Peatman received treatment for headaches in 2008 and 2009, he was consistently described in medical records as alert and oriented; neurologic examinations were normal; and he reported improvement in his headaches with medication. (AR 382, 384, 448, 461, 470, 472.)

In December 2008, Peatman was evaluated by consultative psychologist Dr. Paul Candido. (AR 420-24.) The results of such evaluation provide further support for the ALJ's RFC determination. (*Id.*) As noted by the ALJ, Dr. Candido's mental status testing of Peatman was "unremarkable." (AR 12.) Specifically, Dr. Candido's report indicates that Peatman worked with "very good attention and concentration," performed

---

[3] Peatman contends that the record reflects that he was scheduled to undergo neuropsychological testing sometime after the administrative hearing, and that the ALJ should have requested the results of such testing before making his decision. (Doc. 13 at 17.) But Peatman did not request that the ALJ hold the record open pending such evidence, nor did he submit such evidence to the Decision Review Board. While the ALJ has a duty to make a complete record, "this requirement can reasonably require only so much," and in this case, the ALJ was not required to do more than he did. *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004); *see Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999).

serial sevens "easily and without error," demonstrated "adequate" ability to manage his own funds, had "above average" verbal reasoning, exhibited "appropriate" social reasoning, and reflected a "good" understanding of social conventions and institutions. (AR 422.) Dr. Candido's report also reveals that Peatman had "[s]uperior" auditory memory functioning, "[a]verage" visual memory functioning, and "[h]igh [a]verage" general immediate and delayed memory functioning, and "[h]igh [a]verage" attention and concentration skills. (AR 423.)

Therefore, the medical records and opinions of treating physician Dr. Jenkyn and consulting psychologist Dr. Candido support the ALJ's RFC determination; and Peatman's contention that "there is no medical evidence from *any physicians*, whether examining, treating, or non-examining," which supports the ALJ's RFC determination (Doc. 13 at 13) lacks merit.  Furthermore, the ALJ's RFC determination was properly based largely on non-medical evidence, including Peatman's ability to attend college and work after the original 2000 head injury, to engage in full activities of daily living, and to function without having to take prescription medication or see a counselor.  Specifically, the ALJ accurately stated:

> During the years since [Peatman's] brain injury, he attended college and
> worked as a mechanic and as a parts manager.  In fact, he recently returned
> to work in October 2009, but left shortly thereafter when he reportedly hit
> his head yet again. . . .
>
> In a consultative examination completed ten months after the alleged onset
> date . . . , [Peatman] reported he . . . was engaged in rather full activities of
> daily living, including driving his son to and from school, making him
> meals, driving him to baseball[,] and helping him with homework, as well
> as performing chores around the house and in the yard.  Similarly,
> [Peatman's] girlfriend, in an effort to describe how he does not finish tasks,

> reports he has multiple projects underway, including building a fence, remodeling the bathroom and cleaning the garage. . . . [Peatman] also acknowledges that he has neither taken prescription medication for the past several months nor seen a counselor since Christmas due to a lack of insurance which he testifies was, in part, an administrative error. However, on additional questioning, [Peatman] acknowledges he was reinstated for Medicaid, but just has not yet reconnected with his treating sources, suggesting his symptoms are not as severe as alleged.

(AR 12.) The record supports these findings, and the ALJ was fulfilling his duty as an adjudicator to weigh the evidence and make findings such as these in determining Peatman's RFC. *See Schacht v. Barnhart*, No. 3:02 CV 1483 (DJS)(TPS), 2004 WL 2915310, at *12 (D. Conn. Dec. 17, 2004). In fact, the regulations provide that the ALJ must assesses the claimant's RFC "based on *all* the relevant evidence in [the] case record," not based on the medical evidence alone. 20 C.F.R. § 404.1545(a)(1) (emphasis added).

Peatman asserts that the ALJ erred in rejecting the May 2009 opinion of treating physician Dr. Joseph Theriault that Peatman was unable to work due to his "[h]istory of traumatic brain injury." (AR 473.) But the ALJ correctly stated that this opinion is "unsupported by the record evidence." (AR 13.) Dr. Theriault's own treatment notes reveal that, as of February 2009, Peatman's headaches were "[s]table and improved" with medications (AR 461); on May 13, 2009, Peatman reported that his headaches had "improved with Treximet" (AR 472); and on May 28, 2009, Peatman reported that "Maxalt works for immediate relief of headache" (AR 470). Furthermore, the treatment notes lack any observations related to functional limitations. (*See* AR 447-48, 457-61, 468-72.) Moreover, reports from at least one other treating physician (Dr. Waheed) and

one consulting psychologist (Dr. Candido), both of which were discussed above, refute Dr. Theriault's opinion. (*See* AR 422-23, 465-66.)

Peatman further asserts that the ALJ "should have obtained a medical source statement from either a treating or consultative physician to assist in determining Mr. Peatman's RFC." (Doc. 13 at 14.)  But where, as here, "there are no obvious gaps in the administrative record" and the ALJ "possesses a complete medical history," the ALJ "is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (internal quotation marks omitted).

## III.    Substantial Evidence Supports the ALJ's Credibility Determination.

Peatman next argues that the ALJ erred in his credibility determination.  It is the province of the Commissioner and not the reviewing court to "appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).  Thus, if the Commissioner's credibility findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints. *Id.* (citing *McLaughlin v. Sec'y of Health, Educ., and Welfare*, 612 F.2d 701, 704 (2d Cir. 1982)).  "When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements."  SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996).  These reasons "must be grounded in the evidence and articulated in the determination or decision." *Id.*  Here, the ALJ explicitly considered the record and gave specific reasons for his determination that Peatman's subjective

complaints were not entirely credible.

As noted above, the ALJ made the following credibility determination regarding the severity of Peatman's impairments: "[B]ased upon the limited objective medical evidence underpinning his allegations, his years of successful functioning following the original brain injury, his activities of daily living[,] and his limited follow-through with treatment, I am obliged to find the severity of his impairments overstated." (AR 12.) Substantial evidence supports these findings. First, there is indeed limited objective medical evidence supporting Peatman's allegations. As discussed above, medical and psychological testing performed on Peatman since his October 2000 head injury has consistently revealed normal results. (*See, e.g.,* AR 279, 351, 362, 405, 465-66.) Although ALJs may not reject a claimant's statements about the effect of his or her symptoms solely because they are not substantiated by objective medical evidence, the absence of such evidence is "one factor that the [ALJ] must consider in assessing [the claimant's] credibility[,] and must be considered in the context of all the evidence." SSR 96-7p, 1996 WL 374186, at *6 (Jul. 2, 1996).

Second, as discussed above, the record supports the ALJ's finding that Peatman was able to work for years after his original October 2000 head injury. (*See, e.g.,* AR 287, 290.) Although it is true, as Peatman claims, that a claimant's good work history may enhance his or her credibility; it is just as true that the same work history may detract from such credibility, depending on the specific facts of the case. *See* 20 C.F.R. 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did.") In this case, especially

15

considering Peatman's daily activities, I find that there is substantial evidence to support the ALJ's assessment regarding Peatman's work history, and it was not improper for the ALJ to consider that history as one factor in assessing Peatman's credibility.

Third, the record supports the ALJ's finding that Peatman engaged in "rather full activities of daily living" during the alleged disability period. (AR 12.) Specifically, the record demonstrates that Peatman prepared his girlfriend's young son for school, took his girlfriend's son to and from school (by bike or walking), prepared meals, helped his girlfriend's son with homework, performed household chores (including doing the laundry, vacuuming, mopping, and doing household repairs), helped with yard work, went shopping for groceries and household items, drove his girlfriend's son to baseball, and cared for his dog. (AR 48-49, 200-03, 246-49, 422.) Further, as pointed out in the ALJ's decision (AR 12), Peatman's girlfriend testified at the administrative hearing that Peatman was working on "several projects," including building a fence, cleaning out the garage, chopping and stacking wood, and helping his girlfriend with remodeling their bathroom (AR 54). ALJs are required to consider a claimant's daily activities, such as those reflected in the record here, in assessing a claimant's credibility.[4] *See* 20 C.F.R. § 404.1529(c)(3)(i). Peatman asserts that the ALJ failed to consider his "clarifying

---

[4] Peatman argues that a claimant's ability to participate in limited household chores does not, in and of itself, prove he has the ability to work. (Doc. 13 at 19.) It is true that the Second Circuit has recognized that "a claimant need not be an invalid to be found disabled," *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998); and that activities like reading, watching television, listening to the radio, and riding buses and subways, are not inconsistent with a disability determination, *see Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983). But the Second Circuit has also held that it is proper for an ALJ to rely on a claimant's daily activities when finding his or her subjective complaints lacking in credibility, particularly where, as here, the claimant engaged in a wide variety of activities. *See, e.g., Calabrese v. Astrue*, 358 F. App'x 274, 278 (2d Cir. 2009).

16

testimony" regarding his daily activities (Doc. 13 at 18-19), but it can be assumed that the
ALJ was aware of such testimony since it took place at the administrative hearing which
was actively conducted by the ALJ.  Moreover, "it is not necessary for the ALJ to address
every item of [a claimant's] testimony and to explain why he considered particular
evidence unpersuasive or insufficient." *Brown v. Barnhart*, No. 04 Civ. 2450(SAS),
2005 WL 991769, at *7 (S.D.N.Y. Apr. 27, 2005) (internal quotation marks omitted).

     Other inconsistencies in the record cast doubt on the accuracy of Peatman's
statements regarding the severity of his condition during the alleged disability period, and
thus support the ALJ's credibility determination.  For example, in December 2008,
Peatman told Dr. Candido that he stopped working in January 2008, not due to his
impairments, but because "he was arrested for his third DWI in three years and lost his
ability to get himself to his job."  (AR 420; *see also* AR 421 ("[Peatman] states that on a
trip back to Burlington on January 25, he 'bought a pint of vodka and was arrested for a
third DWI in as many years,' resulting in his license being suspended.  He was still on
probation for a second DWI at the time.  He has not worked since that time.").)
Moreover, in May 2009, Peatman told Dr. Theriault that he had tried to find part-time
work, but had been unsuccessful "in this economy," implying that the "economy" and not
Peatman's impairments was the cause of his inability to work.  (AR 472.)

## IV.    The ALJ's Hypothetical to the Vocational Expert Was Proper.

     Peatman's final contention is that the hypothetical question posed to the VE did
not include the functional limitations reflected in the record, and thus the VE's testimony
does not provide substantial support for the ALJ's decision.  At the administrative

hearing, the ALJ asked the VE to assume that Peatman (a) was limited to understanding, remembering, and carrying out moderately complex tasks with three, four, or five steps; (b) could not multi-task; (c) would need to avoid complex written or verbal communication; and (d) would be able to deal with co-workers and the public only occasionally and with the public only on a superficial level.  (AR 60.)  As discussed above, I find that substantial evidence supports this RFC, and thus Peatman's argument lacks merit.

Peatman points out that the ALJ found that he had "moderate difficulties" in "concentration, persistence or pace" at step three, but then failed to account for that limitation in the hypothetical to the VE.  The point is well-taken.  As this Court has noted in prior cases, although the Second Circuit has not yet weighed in on the issue of whether a hypothetical question to a VE must specifically account for a plaintiff's limitations in concentration, persistence, or pace in order to accurately portray the plaintiff's impairments; other circuits have addressed the issue and held in the affirmative.  *See, e.g., Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009).  At most, however, the ALJ's error in this case was harmless because the hypothetical to the VE "accurately portray[ed] [the plaintiff's] individual physical and mental impairments," *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (internal quotation marks omitted); *see De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984); and an ALJ may rely on the testimony of a VE in response to a hypothetical question if the VE's testimony "addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job." *Aubeuf v. Schweiker*, 649 F.2d

18

107, 114 (2d Cir. 1981). For the same reason, even if (as Peatman asserts) the ALJ's finding at step three that Peatman was moderately limited in his concentration, persistence, or pace was inconsistent with the ALJ's RFC finding that Peatman could perform jobs requiring an ability "to understand, remember and carryout moderately complex four to five step tasks which do not involve multi-tasking" (AR 11), the error was harmless.

Lastly, Peatman contends that the ALJ erred in failing to account for the limitations identified by vocational rehabilitation counselor Lindsay Price in his hypothetical to the VE. In what appear to be identical letters from January and March 2009, respectfully, Price opined that Peatman had difficulties with "short and long term memory, verbal and written processing, organization, concentration, impulse control, adjusting to new situations, initiating and following through, and takes longer to do a job." (AR 451, 454.) Price concluded that, "[a]s a result of the[se] challenges," Peatman "has been unable to sustain employment for a substantial amount of time." (*Id.*) The ALJ was not required to address Price's opinions. Not only is Price not a physician or psychologist (and thus the treating physician rule does not apply), there is no indication in the letters as to how long she has treated Peatman and in what frequency. Moreover, the opinions are too general to be of much value, as they do not specify the level of difficulty Peatman had with the various activities mentioned, how Price arrived at her conclusions, and what medical (or other) bases these opinions rest on. Further, Price's opinions conflict with those of other medical providers, including those of treating physician Dr. Jenkyn and consulting psychologist Dr. Candido, discussed above. Finally,

the functional limitations included in Price's letters are not supported by the objective

medical evidence or Peatman's daily activities, as also discussed above.

### Conclusion

For these reasons, I recommend that Peatman's motion (Doc. 13) be DENIED, and

the Commissioner's motion (Doc. 16) be GRANTED.[5]

Dated at Burlington, in the District of Vermont, this 21st day of November, 2011.


_____/s/ John M. Conroy_____
            John M. Conroy
            United States Magistrate Judge


Any party may object to this Report and Recommendation within fourteen days after
service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge
and all parties, written objections which shall specifically identify those portions of the
Report and Recommendation to which objection is made and the basis for such
objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c).
Failure to timely file such objections operates as a waiver of the right to appellate review
of the District Court's adoption of such Report and Recommendation. *See* Fed. R. Civ. P.
72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

---

[5] Peatman notes in his reply brief that the ALJ incorrectly stated in his decision that the alleged
disability onset date was October 22, 2000 and not February 1, 2008, which Peatman amended it to at the
administrative hearing. (*See* FN 1, *supra*.) Despite these notations in his brief, however, Peatman has not
charged that this error is cause for remand, presumably because the error does not appear to have affected
the ALJ's ultimate decision (i.e., the ALJ would have found Peatman not disabled regardless of whether
his alleged disability onset date was in 2000 or 2008).